NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | : | |
|---|---|---|
| **I-MED PHARMA, INC.** | : | |
| | : | Civil Action No. 03-3677 (DRD) |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| v. | : | |
| | : | |
| **BIOMATRIX, INC., GENZYME** | : | |
| **CORP., and GENZYME** | : | **OPINION** |
| **BIOSURGERY, a division of Genzyme** | : | |
| **Corp.** | : | |
| | : | |
| **Defendants.** | : | |
| _____ | : | |

**Appearances**

Gary Maitland, Esq.
KREISBERG & MAITLAND, LLP
14 Penn Plaza, Suite 1000
New York, NY 10122

*Attorneys for Plaintiff*

Andrew P. Fishkin, Esq.
EDWARDS ANGELL PALMER & DODGE
51 John F. Kennedy Pkwy.
Short Hills, NJ 07078

Thane D. Scott, Esq.
Katherine Hollingsworth, Esq.
EDWARDS ANGELL PALMER & DODGE
111 Huntington Ave.
Boston, MA 02119

*Attorneys for Defendants*

Michael B. Parson
KREISBERG & MAITLAND, LLP
14 Penn Plaza, Suite 1000
New York, NY 10122

*Attorneys for Third Party Biocia*

Sheryl Schwartz, Esq.
HEROLD & HAINES PA
25 Independence Blvd.
Warren, NJ 07059

*Attorneys for Third Party Endre Balasz, MD*

**SALAS, United States Magistrate Judge**

## I.  INTRODUCTION

Before this Court are certain outstanding discovery disputes raised by Plaintiff I-Med Pharma, Inc. ("Plaintiff") and Defendants Biomatrix, Inc., Genzyme Corp., and Genzyme Biosurgery, Inc. (collectively "Defendants[1]").  Pursuant to an October 13, 2006 Order, Plaintiff and Defendants each submitted: (1) a letter brief setting forth their respective positions on all remaining discovery disputes, and (2) a response to the other party's letter brief.

While Plaintiff's and Defendants' respective submissions identify numerous individual discovery deficiencies, many of said deficiencies reflect the parties underlying dispute[2]

---

[1] Defendant Biomatrix, Inc. was acquired by Defendant Genzyme Corp. in December of 2000.  Defendant Genzyme Biosurgery, is the division of Defendant Genzyme Corp. that continues to manufacture the Hylashield Products that were the subject of the distributorship agreements entered into between Plaintiff and Defendant Biomatrix, Inc.  (*See* Opinion at p. 2, December 22, 2003).

[2] Perhaps the best indication that a fundamental disagreement regarding relevance pervades the parties discovery disputes is the volume of the parties respective submissions.  Plaintiff's submissions regarding discovery deficiencies include: (1) a 22-page single-spaced letter brief dated November 14, 2006 that includes an redweld full of exhibits, and a (2) a 6-page singe-spaced letter brief dated November 20, 2006 that includes 6 exhibits.  Defendants'

regarding the scope of relevant discovery. After reviewing said submissions, the Court determined that the most efficient way to resolve the seemingly endless list of individual discovery deficiencies was to resolve this underlying relevance dispute. (Hr'g. Tr. at 3:3-24, January 10, 2007). Thus, relevance became the focus of the January 10, 2007 hearing. (*See generally id.*).

First, the Court heard extensive argument from both sides regarding the scope of the two distributorship agreements that are the subject of this litigation. (Hr'g. Tr. at 3:3-39:3; 47:19-51:10, January 10, 2007). Next, the Court also heard argument regarding the relevance of discovery related to a business venture known as Biocia and the relevance of due diligence documents from Defendant Genzyme Corp.'s acquisition of Defendant Biomatrix, Inc. [*Id.* at 51:13-62:13 (argument regarding Biocia); 62:15-69:14 (argument regarding due diligence documents)]. Finally, the Court also considered the parties' respective positions regarding the scope of the November 18, 2005 Protective Order. (*Id.* at 41:5-47:6).

During the January 10, 2007 hearing, the Court also resolved several other outstanding discovery issues on the record. Over the course of the hearing, it became clear that the parties agreed that certain information was relevant and discoverable. Specifically, Defendants agreed with Plaintiff's position that information about the closure of the manufacturing plant in Pointe Claire, Quebec and information about the Hylashield Products was relevant and discoverable. [*See* Hr.'g Tr. at 20:12-15, January 10, 2007 (Defendants represent to the Court that they have provided documents regarding the closure of the Pointe-Claire plant);

---

submissions regarding discovery deficiencies include: (1) a 10-page single-spaced letter brief dated November 14, 2006 that includes 14 exhibits; and (2) a 15-page single-spaced letter brief dated November 21, 2006 that includes 24 exhibits.

*see also id*. at 68:15-22 (Defendants represent that they have produced documents related to the Hylashield Products)]. Moreover, the Court ruled that the Protective Order shall remain in place and Defendants assured the Court that were complying with its procedures for dedesignation of documents that are not subject to its protections. [*Id*. 42:3-45:17 (the Court's colloquy with Defendants' counsel regarding the dedesignation of documents where appropriate)]. At several points in the proceeding, the Court reminded the parties of their duty to meet and confer to ensure that areas where they agree are not presented to the Court as discovery disputes. (*See e.g.*, *id*. at 69:16-70:19)

Finally, the Court also explicitly reserved on certain issues and established how it will manage discovery going forward. (Hr'g. Tr. at 71:6-72:11, January 10, 2007). Among the areas where the Court reserved were: (1) Plaintiff's request to continue the deposition of Dr. Endre Balazs[3]; and (2) the parties' dispute regarding documents subject to the attorney-client and work product privilege. (*Id*.)

---

[3] At the request of the Court, the parties submitted separate letter briefs regarding Plaintiff's application for an Order granting Plaintiff additional time to conduct the deposition of Dr. Endre Balazs. The Court also received a letter brief in opposition to Plaintiff's request from Dr. Balazs' counsel. The Court will consider these letter briefs and decide this issue in due course.

## II.  FACTUAL BACKGROUND[4]

### A.  The 1994 and 1995 Distributorship Agreements[5]

The underlying relevance dispute flows from the parties' antagonistic interpretations of the two distributorship agreements that are the subject of this litigation. Pursuant to the first distributorship agreement, entered into on or around July 20, 1994 (the "1994 Agreement"), Defendant Biomatrix granted Plaintiff the right to distribute the products known as Hylashield and HSS.  The second distributorship agreement, entered into on or around October 4, 1995 (the "1995 Agreement"), granted Plaintiff the right to distribute products known as Hylashield Nite and Hylashield Lite.  The 1994 Agreement and the 1995 Agreement (collectively "Agreements") contain similar terms, but covered different products.

First, both Agreements contain the following identical "best efforts" language in the last sentence of paragraph 6.2:

> Biomatrix shall use efforts comparable to those used for its own Products during the term of this Agreement to sell to the Distributor all of the Distributor's requirements for the Products, provided that Biomatrix shall in no event be obligated to provide Products to the Distributor in any calendar year in excess of 25% higher than the maximum quantity specified in the Buying Plan (as defined in Section 6.1).

(*See* 1994 Agreement, paragraph 6.2; 1995 Agreement, paragraph 6.2).

Next, each of the Agreements also contains a right of first refusal at paragraph 3.2. While the two right of first refusal provisions are similar, their subtle differences are significant.

---

[4] The Court refers to Judge Debevoise's July 23, 2004 Opinion denying Defendants' motion to dismiss Plaintiff's amended complaint for a detailed overview of the relevant facts.

[5] [*See* Defs.' Letter Br. dated November 21, 2006, Ex. 1 (the 1994 Agreement) and Ex. 2 (the 1995 Agreement)].

In the 1994 Agreement, paragraph 3.2 reads:

> Biomatrix grants to Distributor, the right of first refusal, to promote, distribute, and sell on an exclusive basis in the Territory any new products that may be manufactured, marketed, or sold by Biomatrix that are designed and intended in the future to replace or compete with the original Hylashield or HSS products covered in the Agreement.  This Agreement does not cover or include any other Biomatrix products that might be used for other future medical indications than those intended for treatment with Hylashield or HSS.

(*See* 1994 Agreement, paragraph 3.2).

The language of paragraph 3.2 in the 1995 Agreement offers Plaintiff a narrower right than its

1994 counterpart with:

> Biomatrix grants to Distributor, **during the term of this Agreement,** the right of first refusal, **limited to a period of sixty (60) days from the time when such products have complied with local regulatory laws,** to promote, distribute, and sell on an exclusive basis in the Territory[6] any new products that may be manufactured, marketed, or sold by Biomatrix that are designed and intended in the future to **improve or** replace ~~or compete with~~ the original ~~Hylashield or HSS~~ **Hylashield Nite or Hylashield Lite** products covered in the Agreement.  This Agreement does not cover or include any other Biomatrix products that might be used for other future medical indications than those intended for treatment with Hylashield or HSS.

[*See* 1995 Agreement, paragraph 3.2 (emphasis added to highlight the differences between paragraph 3.2 in the 1994 Agreement and paragraph 3.2 in the 1995 Agreement)].

Plaintiff contends that Defendants are unjustifiably limiting discovery to the

Hylashield Products.  (Hr'g. Tr. at 20:19-39:3, January 10, 2007).  Citing paragraphs 3.2 and 6.2

---

[6] The definition of "Territory" is also narrower in the 1995 Agreement.  Pursuant to the 1994 Agreement, the distribution territory included, without qualification, Canada, Bahamas, and the English speaking Caribbean island nations.  (*See* 1994 Agreement at paragraph 1.5).  In the 1995 Agreement, the distribution territory only included Canada.  (*See* 1994 Agreement at paragraph 1.5).  However, the 1995 Agreement did provide for expansion of the distribution territory to "the Bahamas and the Carribean island nations after the Distributor satisfactorily proves to Biomatrix regulatory approvals for the extended Territory and Distributor's ongoing sales capacity for each Caribbean island nation."  (*See* 1995 Agreement at paragraph 1.6).

of the Agreements, Plaintiff argues that both the Hylashield Products and "other viscoelastic products for the ophthamological market" are relevant for purposes of discovery. [*Id*. at 33:14-33:19 ("I want to be crystal clear, we're looking for production documents, inventory documents, shipment documents, and contractual agreement with others involving viscoelastic products for the opthamological market, whether named in the contracts, other than the four names that are in, or whether otherwise named"). According to Plaintiff, paragraph 6.2 compels Defendant Biomatrix to use the same efforts it would use to market other viscoelastic products for use in the opthamological market. (*Id*. at 20:16-24:16). Furthermore, Plaintiff alleges that paragraph 3.2 grants a right of first refusal with respect to other viscoelastic products for use in the opthamological market. (*Id*. at 31:15-18).

The predicate of Defendants' more restrictive view of discovery is its narrower reading of paragraphs 3.2 and 6.2. (Hr.'g. Tr. at 8:4-20:18; 47:19-51:10, January 10, 2007). According to Defendants, the Agreements "[are] drafted quite narrowly to give I-Med defined distribution rights in a precisely defined territory with a precisely defined performance standard." (*Id*. at 49:25-50). Defendants go on to cite the restrictive language that Plaintiff allegedly omits. (*Id*. at 11:21-12:7). First, Defendants argue that Plaintiff's reading of paragraph 6.2 ignores the definition of "Products" in each of the Agreements as both define "Products" to include the Hylashield Products that are the subject of that respective agreement. (*Id*.). Thus, Defendants contend that paragraph 6.2 only considers Defendant Biomatrix's efforts to provide Hylashield Products to itself (for its own distribution) and to other third party distributors of Hylashield Products. (*Id*.). Likewise, Defendants argue that Plaintiff's reading of paragraph 3.2 in each of the Agreements ignores clear contractual language. (*Id*. at 47:19-51:10). According to

Defendants, the last sentence of paragraph 3.2, "establishes a fence around Hylashield and HSS, which they have distribution rights for, and replacement products for medical indications identical to those products." (*Id*. at 49:13-17).

## B.     Due Diligence Documents

As a part of its relevance inquiry, the Court also heard argument on the propriety of Plaintiff's requests for due diligence documents related to Defendant Genzyme Corp.'s acquisition of Defendant Biomatrix, Inc. (Hr'g. Tr. at 62:15-69:14). During the January 10, 2007 hearing, it became clear that this dispute was bound up in the parties fundamental disagreement regarding the scope of paragraphs 3.2 and 6.2. (*See id*.).

First, Plaintiff dispelled the notion that it was seeking each and every document generated in the due diligence process. (*See* Hr.'g Tr. at 63:17-68:10, January 10, 2007). Instead, Plaintiff described a more focused request for, "the due diligence work of any and all persons involved in bringing about this merger as it related to the valuation of all Hylashield product line in any of its permutations , the market for it, and the projected market shares." (*Id*. at 66:6-10). Furthermore, Plaintiff was adamant that Defendants should not limit production to analyses of the Canadian market. (*Id*. at 66:11-21). Finally, Plaintiff also suggest that due diligence work related to Synvisc was also relevant as Defendants may have breached the Agreements by diverting too much attention to this product. (*Id*. at 64:6-12).

Defendants, on the other hand, argue that they have placed reasonable limitations on Plaintiff's overly broad request for due diligence documents. (Hr.'g. Tr. at 62:15-63:10, January 10, 2007). Specifically, Defendants describe a temporal limitation and a substantive limitation. (*Id*.). Pursuant to the former limitation, Defendants only produced documents dating

back to the time when Biomatrix and I-Med began their negotiations in 1993. (*Id*. at 62:21-63:3). Pursuant to the latter limitation, Defendants reiterate their argument regarding the limited scope of the Agreements and argue that Plaintiff was only entitled to due diligence documents related to the Hylashield Products. (*Id*. at 63:4-10).

**C.     Biocia**

Interestingly, the parties views on the contours of Rule 26 changed when the Court considered argument regarding Biocia[7]. (Hr'g. Tr. at 51:13-62:13, January 10, 2007). Defendants contend that Biocia is relevant for purposes of discovery for two reasons. (Hr'g. Tr. at 51:14-55:6, January 10, 2007). First, Defendants argue that the jury has a right to know about the current business venturers of a witness who is poised to take the stand with "a Biomatrix label attached to him." (*Id*. at 52:14-53:8). Next, Defendants argue that they are entitled to know more about Biocia's business to determine whether or not its is an appropriate benchmark to gauge Plaintiff's damages theories. (*Id*. at 53:9-55:6).

While questioning the relevance of discovery related to Biocia, Biocia's argument focuses on the fact that the company has never been noticed for a deposition. (*See* Hr.'g Tr. at 55:19-20, January 10, 2007 (Biocia's counsel begin his remarks with, "[l]et me first point out before anything else, that no one has ever asked Biocia for anything.")]. Biocia also takes exception with Defendants' position that its business represents an appropriate gauge of Plaintiff's damages theory. (*Id*. at 56:6-11). According to Biocia's counsel, this relatively new company has only developed a nasal product and an eye drop that "has nothing to do with

---

[7] Plaintiff describes Biocia as, "an independent venture of Wesley Domareki, a former Genzyme employee, and Dr. Ilan Hofmann." (Pl.'s Letter Br. at p. 4, November 20, 2006).

hyaluronic acid...the primary ingredient of the Hylashield line." (*Id*. at 56:6-20).

### III.  DISCUSSION

**A.  Federal Rule of Civil Procedure 26**

Rule 26 defines the bounds of relevant discovery.  Fed. R. Civ. P. 26.  Pursuant to subparagraph (b)(1), "parties may obtain discovery regarding any matter, not privileged that is relevant to the claim or defense of any party."  Fed. R. Civ. P. 26(b)(1).  As this Court has already recognized, "courts have construed this rule liberally as providing for a broad vista of discovery."  *Tele-Radio Systems v. DeForest Elec., Inc.*, 92 F.R.D. 371, 375 (D.N.J. 1981) (Fisher, J.); *see also Evans v. Employee Benefit Plan*, 2006 WL 1644818, 4 (D.N.J. 2006) (Kugler, J.) (citing *Tele-Radio Systems*).  In interpreting Rule 26(b)(1), district courts must remain mindful that relevance is a broader inquiry at the discovery stage than at the trial stage.  *Nestle Foods Corp. v. Aetna Cas. & Sur. Co.*, 135 F.R.D. 101, 104 (D.N.J. 1990)

While broad, discovery is not boundless.  Rule 26(b)(2) vests the District Court with the authority to limit the parties pursuit of otherwise discoverable information.  The Third Circuit recognized this discretionary power with, "[a]lthough the scope of discovery under the Federal Rules is broad, this right is not unlimited and may be circumscribed."  *Bayer AG v. Betachem, Inc.*, 173 F.3d 188, 191 (3d Cir. 1999).

**B.  The Scope of Relevant Discovery**

**1.  Other Viscoelastic Opthamological Products**

Because information about the Hylashield Products and other viscoelastic opthamological products relate to Plaintiff's contractual claims, said information is relevant and discoverable.  Paragraph 3.2 of the 1994 Agreement represents a gaping hole in the relevance

-10-

fence described by Defendants. Said provision grants Plaintiff a right of first refusal with respect to distribution of, "any new products that may be manufactured, marketed, or sold by Biomatrix that are designed and intended in the future to replace or **compete** with the original Hylashield or HSS products covered in the Agreement." [1994 Agreement, paragraph 3.2 (emphasis added)]. Because the Court is satisfied that other products used to treat the eye may replace or compete with Hylashield or HSS, information about these other eye products is relevant for purposes of discovery.

### 2. Due Diligence Documents

Likewise, due diligence documents related to viscoelastic products for use in the opthamological market[8] are also relevant for purposes of discovery. This conclusion relies on Plaintiff's representation that their request for due diligence documents is limited to the due diligence work related to, "the valuation of all the Hylashield product line in any of its permutations, the market for it, and the projected market shares." (Hr'g. Tr. at 66:6-10, January 10, 2007). The Court found Plaintiff's argument persuasive that the evidence sought may be critical to its damages analysis and therefore relevant. (*Id*. at 68:1-3). However, the Court's finding on this issue is not a blank check to compel Defendants production of every document in their due diligence files. Instead, the Court is simply finding that this very specific request for a limited universe of documents is relevant for purposes of discovery.

---

[8] Because Synvisc is not a viscoelastic product for use in the opthamological market, due diligence documents related to this product are NOT RELEVANT for purposes of discovery.

**3. Biocia**

Finally, Defendants can proceed to serve a *subpoena duces tecum* upon Biocia. Defendants seek information about Biocia that is relevant and discoverable. [Hr.'g Tr. at 54:14-55-1, January 10, 2007 (Defendants articulate the type of information that they seek from Biocia)]. Specifically, the Court agrees with Defendants' argument that Biocia may possess information that it needs to: (1) test the credibility of two key witnesses (Domareki and Hofmann); and (2) evaluate Plaintiff's damages claims. Moreover, Biocia's burden in producing documents and appearing for a deposition is minimal. Because the same law firm that represents Plaintiff also represents Biocia, the expenses it will incur to prepare and participate in a deposition are greatly reduced. Moreover, and as Defendants suggested at the January 10, 2007 hearing, the Protective Order offers Biocia a procedure to protect any information that it deems confidential. (Hr'g. Tr. at 51:20-21, January 10, 2007).

## IV.  CONCLUSION

For the reasons set forth above, information about the Hylashield Products, other viscoelastic products for use in the opthamological market, certain due diligence documents, and Biocia are relevant for purposes of discovery.

s/Esther Salas<br>
**ESTHER SALAS**<br>
**UNITED STATES MAGISTRATE JUDGE**