**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

I-MED PHARMA INC.,

Plaintiff,

v.

BIOMATRIX, INC., GENZYME
CORPORATION and GENZYME
BIOSURGERY, a Division of Genzyme
Corporation.

Defendants.

Civ. No. 03-3677 (DRD)

**O P I N I O N**

*Appearances by:*

KREISBERG & MAITLAND, LLP
by:     Gary Maitland, Esq.
75 Maiden Lane, Suite 603
New York, New York 10038

        *Attorneys for Plaintiff*

BINGHAM MCCUTCHEN LLP
by:     Jessica S. Boar, Esq.
399 Park Avenue
New York, New York 10022

by:     Thane D. Scott, Esq.
by:     Carol E. Head, Esq.
by:     Shuan Lue, Esq.
One Federal Street
Boston, Massachusetts 02110

        *Attorneys for Defendant*

**DEBEVOISE, Senior District Judge**

This case highlights the dangers of carelessness and inattention in e-discovery. The underlying dispute arises from the alleged breach of two medical distribution contracts between Plaintiff I-Med Pharma, Inc. ("I-Med") and Defendant Biomatrix, Inc.[1] Plaintiff alleges that Defendant, in conjunction with its related entities, entered into contracts under which I-Med would be the exclusive Canadian distributor of several medical products produced by Biomatrix. Plaintiff further claims that after a merger with Genzyme, Defendant failed to live up to its obligations to produce the licensed products for distribution.

Presently before the Court is Defendants' Appeal from Magistrate Judge Shipp's September 9, 2011 order. The September 9 order modified the terms of a prior January 14, 2011 order that required Plaintiff to produce the results of a forensic examination of its computer system. Under the terms of the new order, Plaintiff would not be required to produce documents recovered from any unallocated space files found on its system. Defendants claim that Judge Shipp abused his discretion by refusing to order Plaintiff to conduct a costly privilege review of the 95 million pages of documents recovered from the unallocated space files. Plaintiff contends that this appeal is a bad-faith effort by Defendants to force it to spent significant resources on a review of irrelevant data.

For the reasons set forth below, Magistrate Judge Shipp's September 9, 2011 order is AFFIRMED.

---

[1]     According to the allegations in the Complaint, the other Defendants are entities related to Biomatrix – Defendant Genzyme Corp. having purchased or merged with Biomatrix in or about December 2000, creating a new entity, Defendant Genzyme Biosurgery.

## I.      BACKGROUND

Defendants are biotechnology firms who manufacture a variety of medicines and medical devices. This case concerns a distribution agreement concerning several medical products manufactured by Defendants. The products in question are the Biomatrix Hylashield ("Hylashield"), the Hylan Surgical Shield ("HSS"), the Hylashield Nite ("Nite"), and the Hylashield Lite ("Lite").[2]

On or about August 4, 1994, Plaintiff and Biomatrix entered into an agreement (the "1994 Agreement") whereby Biomatrix was appointed the exclusive distributor of Hylashield and HSS in Canada, the Bahamas, and the English speaking Caribbean Island nations. The initial term of the agreement was five years, and the agreement provided that if it was not terminated in writing by either party at least 90 days prior to its expiration date it would be automatically renewed for an additional five years. Similarly, on or about October 4, 1995, Plaintiff and Biomatrix entered into an agreement (the "1995 Agreement") appointing Plaintiff the exclusive distributor in Canada for Nite and Lite. That agreement also was for an initial term of five years, and it also provided for an automatic five year renewal if neither party gave notice of termination. Neither party terminated either agreement prior to renewal.

In connection with the Agreements, Plaintiff took steps necessary to obtain certain product registrations and licenses from Canadian authorities. These included licenses from Health Canada for products distributed under the 1994 Agreement and under the 1995 Agreement, and trademark registrations.

---

[2]      Hylan, a chemical derivative of hyaluronan, is a proprietary gel manufactured by Biomatrix. It has numerous medical applications and is found in many of Defendants' products. The products at issue here are varieties of eye drops that contain Hylan fluid.

In late 2000, Biomatrix entered into a business combination with Defendant Genzyme. Plaintiff claims that it was assured on "numerous occasions" that "no changes would be made" that would affect the business conducted under the Agreements. However, in April 2001, Defendants allegedly closed a facility in Pointe-Claire, Quebec for the production of the distributed products. Defendants then changed the name of Hylashield Lite to Hylashield CL, and stopped delivery of the product to Plaintiff under either name.

The Second Amended Complaint alleges that Defendants did not ship sufficient product under the Agreements or use their best efforts (as mandated by the Agreements) to fulfill Plaintiff's requirements for products. (Doc. No. 44). It also alleges that after the Genzyme combination Defendants failed or refused to supply products or otherwise perform under the Agreements. Id. Plaintiff pleads various species of breach of contract and fraud. Id.

The instant dispute concerns data retrieved from a forensic investigation of Plaintiff's computer system. Pursuant to a May 27, 2010 stipulation between the parties, Defendants hired an expert to conduct a keyword search of I-Med's computer network, servers, and related storage devices. (Doc. No. 182). The search terms run were as follows:[3]

| | | | |
|---|---|---|---|
| back order* | product* | Blephagel | expir* |
| Chalifour and/or Jean-Guy | allet* | Larm | loss |
| Grenon | revenue* | vet* | profit* |
| Domareki and/or Wes | agreement | Oasis | reputation |
| contract* | credit | Bengl and/or Agerup | refund |
| Hyl* | discount | Pagano | refriger* |

---

[3]     In addition, many of the terms were also to be run in French.

| | | | |
|---|---|---|---|
| CL | rebate | Balazs and/or Bandi | repine* |
| HS* | return | Riggs and/or Rofy | FDA |
| HsS | pro forma* | unidose | Health Canada |
| shield* | sample | monodosc | TPP |
| Lite | Biomatrix | visco* | |
| Nite | Genzyme | Laboratories | |
| inventor* | I-Drop | Unither | |
| manufactur* | I-Lid | Excelvision | |
| minimum* | HA | claim | |
| quota* | Siccafluid | complaint | |

The search was not limited to targeted document custodians or relevant time periods. Indeed, the search was not even limited to active files. The expert was instructed to run the search terms across all data on the computer system, including so-called "unallocated space" – areas of computer memory in which there is no write-protection and in which deleted and partially deleted files and other temporary data may often be found.

The results should come as no surprise. The broad search terms hit millions of times across the large data set. In the unallocated space alone, the terms generated 64,382,929 hits. These hits represent an estimated 95 million pages of data.[4] Plaintiff balked at the prospect of conducting a privilege review of this material and petitioned Magistrate Judge Shipp for relief from the stipulation. (Doc. No. 219). On September 9, 2011, Judge Shipp conducted a telephone

---

[4]     The Court has no choice but to take the parties at their word concerning these numbers. However it is troubling that the parties refer to the number of raw hits as though each represented a separate document. Given the volume of hits and search terms used, this is essentially impossible—statistically speaking terms like "profit," "loss," "revenue," and "profit" frequently occur together, and it stands to reason that at least some files mentioning product lines would make reference to more than one at the same time. Consequently, the Court is left to wonder whether the total hit and estimated page numbers are genuinely correct.

conference in which the parties explained their positions on the matter. (Doc. No. 236) ("Tr.").

After permitting both sides a full opportunity to be heard, Judge Shipp issued an order permitting

Plaintiff to withhold the data found in the "unallocated space" of its computer systems. (Doc. No.

235). Cogniscent of the costs Defendants had incurred in extracting and searching this data, the

order permitted Defendants to seek reimbursement of those costs from Plaintiff. Id.

In connection with this order, Judge Shipp made several findings on the record. First, he

found that "good cause" existed to modify his prior order as the "burden on I-Med" would

"outweigh any potential benefit that may result." Tr. 32:10, 32:21-24 ("Tr.") (Doc. No. 236).

Second, he found that Genzyme had not met its burden of demonstrating the complete relevancy

of the information sought, noting that for all of Defendants' complaints about spoliation, it had

not actually identified any information actually destroyed by Plaintiff. Tr. 32:12-20. Finally, he

found that the overbroad search terms made the likelihood of finding relevant information that

would be admissible at trial "minimal." Tr. 33:2-8.

Defendants now appeals from Judge Shipp's order.

## II.    DISCUSSION

### A.    Standard of Review

A Magistrate Judge's decision is to be overturned only to the extent that the ruling is

"clearly erroneous or contrary to law." L.Civ.R.72.1(c)(1)(A). The burden of showing that a

ruling is "clearly erroneous or contrary to law rests with the party filing the appeal." Marks v.

Struble, 347 F. Supp. 2d 136, 149 (D.N.J. 2004). A finding is clearly erroneous "when although

there is evidence to support it, the reviewing court on the entire evidence is left with the definite

and firm conviction that a mistake has been committed." Dome Petroleum Ltd. v. Employers

Mut. Liab. Ins. Co., 131 F.R.D. 63, 65 (D.N.J.1990) (quoting United States v. U.S. Gypsum Co.,

333 U.S. 364, 395 (1948)). Moreover, "[a] ruling is contrary to law if the magistrate judge has misinterpreted or misapplied applicable law." Pharmaceutical Sales and Consulting Corp. v. J.W.S. Delavau Co., Inc. 106 F.Supp.2d 761, 764 (D.N.J. 2000).

Where an appeal seeks review of a matter within the purview of the Magistrate Judge, such as a discovery dispute, an even more deferential standard, the "abuse of discretion standard" must be applied. Kounelis v. Sherrer, 529 F.Supp.2d 503, 518 (D.N.J. 2008) "[w]here a magistrate judge is authorized to exercise his or her discretion, the decision will be reversed only for an abuse of discretion."; see also Holmes v. Pension Plan of Bethlehem Steel Corp., 213 F.3d 124, 138 (3d Cir. 2000) (discovery orders reviewed for abuse of discretion). An abuse of discretion occurs "when the judicial action is arbitrary, fanciful or unreasonable, which is another way of saying that discretion is abused only where no reasonable man would take the view adopted by the trial court. If reasonable men could differ as to the propriety of the action taken by the trial court, then it cannot be said that the trial court abused its discretion." Lindy Bros. Builders v. American Radiator & Standard Sanitary Corp., 540 F.2d 102, 115 (3d Cir. 1976).

There is "particularly broad deference given to a magistrate judge's discovery rulings." Farmers & Merchants Nat. Bank v. San Clemente Financial Group Securities, Inc., 174 F.R.D. 572, 585 (D.N.J. 1997). Federal Rule of Civil Procedure 26(b)(2)(C) grants the Court considerable authority to limit a party's pursuit of otherwise discoverable information where the burden of a discovery request is likely to outweigh the benefits. The Court is directed to "limit the frequency or extent of discovery otherwise allowed by these rules or by local rule if it determines that: (i) the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive; (ii)

the party seeking discovery has had ample opportunity to obtain the information by discovery in the action; or (iii) the burden or expense of the proposed discovery outweighs its likely benefit, considering the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the action, and the importance of the discovery in resolving the issues." See also Bayer AG v. Betachem, Inc., 173 F.3d 188, 191 (3d Cir. 1999) ("Although the scope of discovery under the Federal Rules is unquestionably broad, this right is not unlimited and may be circumscribed…The Federal Rules of Civil Procedure expressly allow a district court to use its discretion and deny discovery requests if the material sought is 'unreasonably cumulative.') (internal citations omitted).

For the reasons described in detail below, this Court finds Judge Shipp's order to be a reasonable exercise of his considerable discretion in managing the scope of permissible discovery.

**B.      The Unallocated Space Files**

Defendants contend that Judge Shipp abused his discretion by applying the wrong legal standard to determine whether to permit relief from the stipulation. Defendants claim that "the Magistrate Judge was required to find, that 'exceptional circumstances' would cause I-Med to suffer 'manifest injustice' if required to perform its obligations." (Def. Br. 6). In support of his position, Defendants cite Waldorf v. Shuta, 142 F.3d 601, (3d Cir. 1998) for the proposition that no discovery stipulation can be modified absent a showing of "manifest injustice." This reading of Waldorf is overbroad, simplistic, and incorrect.

Waldorf involved litigation over a catastrophic auto accident. The Waldorf plaintiff was a passenger who suffered debilitating injury after a collision that occurred near a defective traffic light. Waldorf, 142 F. 3d at 606. The plaintiff sued the drivers, the city that had installed the

8

traffic light, and various city officials. Id. at 607. After an initial $8 million jury verdict was reversed on appeal, the city defendant proposed a deal. Id. It would stipulate to its liability on the condition that the trial be bifurcated and the damages trial against all defendants be tried first. Id. The lower court accepted this stipulation and tried the case as to damages. Id. The result was a $16 million verdict. Id. The city appealed and obtained a new trial. Id. The city then attempted to vacate the verdict and back out of the stipulation. Id. The trial court refused to permit it. Id.

On review, the Court of Appeals upheld the trial court's decision to enforce the stipulation, finding that "exceptional circumstances" justifying relief from the validly executed stipulation did not exist. Id. at 617. In determining whether "manifest injustice" would result unless the city was relieved from its stipulation the court examined four factors: "(1) the effect of the stipulation on the party seeking to withdraw the stipulation; (2) the effect on the other parties to the litigation; (3) the occurrence of intervening events since the parties agreed to the stipulation; and (4) whether evidence contrary to the stipulation is substantial…." Id. at 617-8 (internal citations omitted). The court concluded that when the city "made the stipulation prior to the second trial, it had a full understanding of the legal rights it was relinquishing, and had clear knowledge of the consequences of its stipulation" and that to permit the city to withdraw the stipulation would be "manifestly unfair to [the plaintiff]…." Id. at 618-9.

The instant dispute bears little resemblance to the one in Waldorf. The court in Waldof did not speak to the issue of discovery stipulations and orders. Rather, it addressed the legal standard for vacating a stipulation of *liability*.[5] While both might be broadly termed stipulations, they have very different legal significance. A party seeking to modify the scope of document

___

[5]  Indeed, the lower court was clear that by "stipulation" it meant "an *admission* which 'cannot be disregarded or set aside at will.'" Waldorf v. Borough of Kenilworth, 878 F.Supp. 686, 691 (D.N.J. 1995) (emphasis added) quoting Wheeler v. John Deere Co., 935 F.2d 1090, 1097 (10th Cir.1991). The stipulation at issue here admits nothing, and neither Waldorf opinion suggests that the holding was meant to apply to routine discovery orders.

production before the close of discovery is in a very different position than a party seeking to withdraw a crucial admission of wrongdoing post-trial. During discovery, the parties are still actively uncovering the evidence needed to bring a case to trial and have ample opportunity to modify and adjust their litigation strategy to any important developments. Clearly a court has the power to modify stipulations concerning discovery terms and deadlines while discovery is still ongoing without the showing of manifest injustice. A court could not effectively perform its duty to fairly and efficiently manage discovery if every minor change to a stipulated briefing schedule or deposition date required a showing of "exceptional circumstances" or "substantial and real harm." While courts should not casually discard agreements between the parties, nor should they abrogate their duty to balance both burden and the likelihood of uncovering relevant evidence merely because a party made an improvident agreement.

And even if the Court were to apply the Waldorf standard to this case, the factors identified by the Court of Appeals would still support Judge Shipp's order. The first factor, the effect of the stipulation on the party seeking to modify it, weighs heavily in favor of modification. A privilege review of 65 million documents is no small undertaking. Even if junior attorneys are engaged, heavily discounted rates are negotiated, and all parties work diligently and efficiently, even a cursory review of that many documents will consume large amounts of attorney time and cost millions of dollars.

At oral argument, Defendants' counsel argued that a less costly privilege review could be done by reviewing only documents containing the word "privileged" and producing everything else. This argument is not persuasive.[6] Even when dealing with intact files, potentially privileged

---

[6]      This suggestion was prompted by a question from the Court asking how counsel for the Defendants would conduct a privilege review of the size and nature of the one that they sought to impose on Plaintiff. In spite of the answer given, it is difficult to believe that lawyers from

information may often be found in emails, memoranda, presentations, or other documents that are not explicitly flagged as privileged or confidential. And since the data searched here is likely to contain fragmented or otherwise incomplete documents, it is entirely possible for privileged material to be found without its original identifying information.

The second factor, the impact on Defendants, does not weigh heavily against modification. Judge Shipp found that Defendants had failed to demonstrate a likelihood that relevant non-duplicative information would be found in the unallocated space files. While Defendants claim to have spent thousands of dollars obtaining the data from Plaintiff's computer system, the September 9 order permits them to seek reimbursement of this expense from Plaintiff. Even if it had not, this amount pales in comparison to the millions of dollars in additional expenditure that would be required for Plaintiff to adequately review the material for responsiveness or privilege. Defendants have failed to show that they will suffer any great prejudice as the result of the modification.

The third factor, the occurrence of intervening events, points weakly in favor of modification. While the precise number of hits produced was not known in advance and Plaintiff argues that it could not have predicted the volume of material that the search would uncover, it should have exercised more diligence before stipulating to such broad search terms, particularly given the scope of the search. In evaluating whether a set of search terms are reasonable, a party should consider a variety of factors, including: (1) the scope of documents searched and whether the search is restricted to specific computers, file systems, or document custodians; (2) any date restrictions imposed on the search; (3) whether the search terms contain proper names, uncommon abbreviations, or other terms unlikely to occur in irrelevant documents; (4) whether

---

Bingham McCutchen regularly disclose large quantities of information from their client's files without examining it.

operators such as "and", "not", or "near" are used to restrict the universe of possible results; (5) whether the number of results obtained could be practically reviewed given the economics of the case and the amount of money at issue.

Taking all of the factors[7] together, the Court finds that even under the more stringent Waldorf rule, the September 9, 2011 order would be a proper exercise of Judge Shipp's considerable discretion in this case. While Plaintiff should have known better than to agree to the search terms used here, the interests of justice and basic fairness are little served by forcing Plaintiff to undertake an enormously expensive privilege review of material that is unlikely to contain non-duplicative evidence.

And as the routine administration of discovery matters do not even require this heightened level of attention, the September 9, 2011 order is doubtlessly proper.

### III.    CONCLUSION

For the foregoing reasons, Magistrate Judge Shipp's September 9, 2011 order is AFFIRMED.

s/ Dickinson R. Debevoise
DICKINSON R. DEBEVOISE, U.S.S.D.J.

Dated: December 9, 2011

---

[7]      The fourth factor identified by Waldorf is inapplicable in this case.